GILLESPIE v. STONE, *Appellant.*

1. **Statute of Limitations:** STATUTE OF FRAUDS: TRUSTS. Neither the statute of frauds nor the statute of limitations can be interposed to prevent the enforcement of an agreement made by a purchaser at execution sale to permit the execution defendant to redeem.

2. **Action to Enforce Agreement to Permit Redemption.** In order to maintain such an action, the plaintiff must prove very clearly and satisfactorily; 1st, That such agreement was actually made before the sale; 2nd, That through the contrivance or with the consent of the defendant, it deterred others from bidding at the sale; 3rd, As explanatory of the foregoing, the actual market value of the property at the date of the sale. A great disparity between such value and the price paid has a very material bearing with a court of equity in reaching a conclusion where evidence on the main points is inconclusive; 4th, The date of the offer to redeem, which should be within a reasonable time, if none is limited by the agreement.

*Appeal from Sullivan Circuit Court.*—HON. JOHN W. HENRY, Judge.

AFFIRMED.

*Chas. A. Winslow* for appellant.

1. The evidence is utterly insufficient to sustain the judgment. *Johnson v. Quarles,* 46 Mo. 423; *Forrester v. Scoville,* 51 Mo. 268; *Ringo v. Richardson,* 53 Mo. 385; *Kennedy v. Kennedy,* 57 Mo. 73.

2. The agreement, if any was made, was not in writing, and was, therefore, void under the statute of frauds. There is no evidence of part performance in the case. Stone took possession immediately after the sale, and has remained in ever since. Gillespie paid no money, made no improvements, did not have the possession—in fact, did nothing. The action is for specific performance. *Chambers v. Lecompte,* 9 Mo. 566; *Bowles v. Wathan,* 54 Mo. 261; *Sitton v. Shipp,* 65 Mo. 297.

3. The right of action, if any, is barred by limitation This suit was commenced ten years and six months

after the sale and alleged agreement. Supposing the agreement to be made out by the evidence, the time of the performance is fixed at three months. McDuff, plaintiff's witness, fixes that time, and plaintiff should stand by his statement. This would start the statute in January, 1864, ten years and three months before the suit. *Tatum v. Holliday*, 59 Mo. 422; *Hunter v. Hunter*, 50 Mo. 445; *Thomas v. Mathews*, 51 Mo. 107; *Rogers v. Brown*, 61 Mo. 187.

*A. W. Mullins* for respondent.

1. It is well settled that in cases where property is acquired under such circumstances as are shown in this case, courts will relieve against the fraud. *Rose v. Bates*, 12 Mo. 30; *Slowey v. McMurray*, 27 Mo. 113; *Damschroeder v. Thias*, 51 Mo. 100; *Bedford v. Moore*, 54 Mo. 448; *McNew v. Booth*, 42 Mo. 189; *Estill v. Miller*, 3 Bibb (Ky.) 177; *Brown v. Lynch*, 1 Paige 147.

2. The statute of frauds has no application in this case. *Grove's Heirs v. Fulsome*, 16 Mo. 549; *Rose v. Bates*, 12 Mo. 51; *Slowey v. McMurray*, 27 Mo. 119; *Damschroeder v. Thias*, 51 Mo. 103; *Peacock v. Nelson*, 50 Mo. 261; Hill on Trustees, marg. p. 144, *n.*

3. The defendant having acquired the property in such manner and under such circumstances as to make him a trustee, mere lapse of time, pleaded by defendant, cannot relieve him. *McNew v. Booth*, 42 Mo. 193; Hill on Trustees, marg. p. 60.

NAPTON, J.—This was a petition filed in March, 1874, to transfer to the plaintiff a title acquired in October, 1863, by the defendant to two lots in the town of Milan, in Sullivan county, on the ground of an implied trust growing out of a breach of an agreement made previous to the sale. The plaintiff was security on a note given to defendant in 1861, for $197.29. This note was sued on, and in March, 1863, a judgment was rendered against plaintiff for $235.30, and $13.70 for costs, and the plaintiff, the petition alleged,

being unable to pay, requested the defendant, who was his friend, to buy at the sale, with the understanding that he should bid enough to pay off the judgment, interest and costs, and hold the title as security for this sum, and whenever the plaintiff, or any one else for him, should repay the sum bid with interest, it should be reconveyed to plaintiff or his assignee. It was further alleged that in consequence of this arrangement being communicated to persons who were present at the sale, there were no other bids, and competition was thus prevented, and the lots were bought by defendant for $272, when they were in fact worth $1,000. The circuit court made a decree in conformity with the prayer of the bill. The objections to this decree made in this court, are: 1st, That the evidence was insufficient; 2nd, That the statute of limitations was a bar to the action; and, 3rd, That the statute of frauds prohibited any regard being paid to the agreement, which was merely verbal.

We do not appreciate the force of the last two points. 1. STATUTE OF LIMI- The statute of frauds has no application to TATIONS: statute of frauds: trusts. such cases.

In regard to the statute of limitations, the case of *Rogers v. Brown*, 61 Mo. 187, which has been cited in support of this position, does not apply to this case. That was a case of a deed in fraud of creditors, fraudulent in its inception, and the bar of ten years was held to run from the date of filing the deed for record. It is not pretended that the deed to Stone was fraudulent; on the contrary, the purchase by Stone at the sheriff's sale and the deed he received for the lots were, as the plaintiff avers, made at his request. Whether there was such a lapse of time, after the sale and before any offer to redeem as courts of equity will regard as a bar, will be considered in our examination of the first point.

We deem it unnecessary to refer to authorities, either in the prior decisions of this court or elsewhere, to estab-

2. ACTION TO EN-FORCE AGREEMENT TO PERMIT RE-DEMPTION. lish the general proposition that implied trusts, such as this bill sets up, must be very clearly and satisfactorily proved. Verbal arrangements are so easily misunderstood by the one party or the other, as the evidence in this case will show, that courts. must exercise great caution in basing a decree on such agreements without the most satisfactory proofs. There are four points in this case, and in all similar ones, upon which the evidence should be satisfactory. First, The existence of the agreement asserted in the petition. Second, That through the contrivance or with the consent of the purchaser, such agreement deterred others from bidding. Third, As explanatory of the first two points, the actual market value of the property at the date of the sale. Fourth, The date of the offer to redeem. As the principal witnesses in this case are the plaintiff and defendant, we copy their testimony.

The plaintiff, Gillespie, testified: I was security to the defendant, Martin Stone, on a note given by Owen Wilson. Just after I left here, at the beginning of the war, Stone began a suit on the note against me by attachment, and attached the property here sued for. I came back before judgment was rendered, but did not defend the suit. I was here when the property was sold, and went to Stone and told him I did not have the money to pay him, and that I wanted him to bid in the property and hold it until I could pay him his money and pay the debt, and that if I never got the money he could keep it. He agreed to it and bought the property, and under that agreement I kept others from bidding. Others told me that they would bid, but that I kept them from it. I offered to settle the matter with him, and he talked in different ways about it. In 1868, I told Stone I wanted to fix up the matter and try and pay him, and he told me I had no right there. In 1871, I offered to arbitrate the matter, but Stone refused, and I brought suit. The property was worth from $700 to $1,000 at the time of the sale. The rent of the property was worth $60 a year. On cross-examination, the

said witness stated: There was no one present when Stone and I made the agreement. I don't think there was any judgment against the property except Stone's. I have never tendered Stone any money. I think it was in 1867 that I first spoke to Stone about the matter. There were five lots sold at the sale, and Stone bought three. I recollect of Stone asking me, when I spoke to him once about the property, whether I would have wanted to pay him back his money and take the property if the house had been burned down, but I don't recollect what answer I made. I first learned of the attachment against this property in 1863, March, I think. I have lived in this county ever since. I delayed in this matter because I did not like to sue a man whom I had so much confidence in as I once had in Stone. On re-examination, plaintiff further testified: I being short of money was a reason for letting this matter go on.

The defendant, Stone, testified: There was no agreement between Gillespie and me for Gillespie to have the property back, and no arrangement made to keep any one else from bidding. Gillespie told me that he could not raise the money, and that if I would give the amount of my debt for the property he would not bother about it; that he would rather I would have the property than any one else. The judgment under which the sale was made was rendered in this court in March, 1863, and the sale was at the October term of the same year. Dr. Sands had a judgment which was also a lien on this property, and I would not agree to give my debt for the property unless Gillespie would arrange to have the lien of Dr. Sands' judgment discharged. I did not say to McDuff that I was going to give Gillespie three months to redeem the property in. I had no talk with him about it before the sale. After the sale, McDuff, who was then drinking very hard, spoke to me about buying the property, and I said to him that Gillespie and I had been very good friends and that I would let him have the property cheaper than any other

man.    The property was not worth over $200 or $300 at the time of the sale.    Gillespie never spoke to me about the property till a short time before this suit was brought; he said he would like to pay me my money back and get a deed to the property.    I told him that I thought the property was mine and that he had no interest in it; that I had paid out considerable money for taxes and repairs and improvements;   there was considerable talk  between  us and I asked him:   Suppose the property had burned down during the war, would you have paid me back my money? and he said that would be another question.    Stone further testified that Gillespie told him that he, Gillespie, could put him, Stone, to trouble about the title, but if Stone would make it bring the debt, the matter would be all right.

As it is obvious that upon this testimony the plaintiff failed to establish his case upon any of the four points involved, to which we have referred, since the two witnesses contradict each other upon each of these points, I will add here, before considering the weight of all the testimony together, the evidence of the other witnesses in the case. W. T. Hodge, on behalf of the plaintiff, testified:   I know Stone and Gillespie, and was present at the sale.    I do not remember of having any conversation with Gillespie about not bidding on the property.    I had a conversation with Stone on the day of sale.   I told him I would give more than the debt for the property.    Stone asked me if he bid it off, if I would take it off his hands.    I told him I would. After the sale Stone never came around to see me, and I never went to see him about the matter.

A. S. McDuff, a witness for plaintiff, testified:   I was living in Milan in 1863, and have resided here ever since. I know the property in controversy.    I spoke to Stone about buying the property some time before it was sold. I said I would give more than the debt for it.    Stone said he would buy it at the sale and let me have it for his debt. After the sale I spoke to Stone about it, and he said he was going to give Gillespie three months to redeem it in; that

Gillespie v. Stone.

it was a hard debt for him to pay, as it was a security debt; that if Gillespie did not take the property I could have it. Four or five months after that I spoke to Stone about the property, and he asked me $700 or $800 for it. This was all the evidence offered by plaintiff except in rebuttal.

Oliver P. Phillips was next sworn by the defendant, and testified: I was sheriff when this property was sold, and made the sale; the sale was an open one and made in the ordinary way. Stone bid the amount of the debt and costs, and paid the bid; the debt was going to him.

Judge G. D. Burgess testified: I was present at the sheriff's sale in this case; the understanding between Stone and Gillespie was that Stone was to make the property bring the amount of his debt against Gillespie. Here the defendant rested.

The plaintiff then introduced Dr. J. E. Nelson, who testified that the rents of the property had been worth $6 per month for the last two years. J. M. Swallow testified that the rents of the property had been worth $8 per month for the last four years. The plaintiff, in his own behalf, further testified that he told Stone, the defendant, that he, Gillespie, would pay off and release the property from the Sands judgment, which he, Gillespie, did pay off and release afterwards. This was all the evidence offered in the case.

In regard to the existence of the agreement claimed in this case, the direct proof is necessarily confined to the statements of plaintiff and defendant, as no one else was present as a witness of it. The statement of plaintiff is: "I went to Stone and told him I did not have the money to pay him, and that I wanted him to bid in the property and hold it until I could pay him his money and pay the debt, and that if I never got the money he could keep it. He agreed to it and bought the property." The defendant says: "There was no agreement between Gillespie and me for Gillespie to have the property back, and no arrangement made to keep any one else from bidding. Gillespie

told me that he could not raise the money, and if I would give the amount of my debt for the property he would not bother about it; that he would rather I would have the property than any one else. ⁎     ⁎     Dr. Sands had a judgment which was also a lien on the property, and I would not agree to give my debt for the property unless Gillespie would arrange to have the lien of Dr. Sands' judgment discharged." There is nothing remarkable or surprising in this diversity in the memory of the two parties to a conversation which had occurred more than eleven years before the trial; though it is a little singular that the defendant, who is assumed to be, from the very nature of the charges now made against him, a shrewd man in business matters, should consent to buy, with an agreement that plaintiff might redeem at an indefinite period or whenever he could get the money. However this may be, notwithstanding the old rules of chancery pleadings have been abolished, and plaintiff and defendant both made competent witnesses, I presume that even under our new system of practice, where the two parties contradict each other on a material issue, there must be, independent of plaintiff's statement, some corroboration of it from other witnesses to authorize the court to disregard the denial of the defendant under oath.

I confess that I have been unable to find evidence having the slightest tendency to confirm the plaintiff's statement of the agreement. The only witness who testifies on the subject is McDuff, who says he spoke to Stone before the sale, and told Stone he would give more than the debt for the property, and after the sale he again spoke to Stone about it, who said "he was going to give Gillespie three months to redeem it in; that it was a hard debt on Gillespie." This surely is no confirmation of the agreement claimed and sworn to by plaintiff, for the reason, first, that the latter was an agreement allowing a redemption in an indefinite length of time; and, second, because Stone did not say that there was any agreement at all between him and

Gillespie, but simply that he was going to give Gillespie three months to redeem it in. To say nothing of Stone's contradiction of this testimony of McDuff, Judge Burgess, who was present at the sale, says: "The understanding between Stone and Gillespie was that Stone was to make the property bring the amount of his debt against Gillespie."

I will, however, pass by this point and assume that the agreement stated in the petition was proved, and proceed to consider the evidence on the second point. The existence of such an agreement as is charged is of no importance, unless by consent or connivance of the defendant, it was used to deter and did, in fact, deter outside bidders and thus prevented competition, for though a breach of such an agreement might of itself render the purchaser obnoxious to the code of honor, yet there being no consideration for it, to bring it within the jurisdiction of a court of equity, it must be accompanied with the fact that its existence prevented competition, and thus operated as a fraud upon the debtor, in which the purchaser and creditor participated, and this fraud is, in short, the basis of the trust which equity implies in such cases. The testimony of the plaintiff on this point is: "Under that agreement I kept others from bidding; others told me that they would bid, but that I kept them from it." The testimony of the defendant is: "No arrangement was made to keep any one else from bidding." There is really no contradiction in these statements, for plaintiff does not say that the defendant was at all aware of what he (the plaintiff) had said to others, or that any arrangement was made between them on that subject. One would think that on a point of such importance the plaintiff would have had some of the persons to whom he spoke summoned as witnesses. No such witness, however, was produced, if the record before us contains all the evidence.

But assuming that a general impression prevailing among the crowd who attended the sale, however produced,

would have a tendency to establish the fact that the defendant, if not actively participating in producing it, was at least passively acquiescing in it, in order to get the property at a sacrifice, where is the evidence of such a general understanding, and where are the bidders who declined becoming such on such grounds? Judge Burgess, who was present and who was a witness on the trial, seemed to be totally ignorant of any such general impression. All that he knew or heard, it would seem from his statement, was that Stone was to bid up the property to a sum which would extinguish his claim. The witness Hodge was also present at the sale and had a conversation with Stone and told him he would give more than the debt, and Stone inquired of him if he, Hodge, would take it off his hands, if he, Stone, bid it in at the amount of the debt, and the witness replied that he would. But that was the last of it; he neither bid, nor applied to Stone to buy after the sale. It does not appear that he was anxious to invest, nor does it appear that he was prevented from bidding by anything said to him by Stone, nor that Stone said anything to him of any agreement between him and Gillespie for the privilege of redeeming. On the contrary it is more reasonable to infer from the language of both parties, that the only agreement that Stone knew anything of was that the property should not be allowed to be sold for less than the debt. In fact, the language of Stone, if correctly reported by the witness, would lead to the inference that Stone, by asking the witness if he would take the property from him in the event of his being the purchaser, was clearly unconscious of any obligation he was under to allow Gillespie to redeem at any time, or at all events he utterly repudiated then any such obligation on his part. The same remark is applicable to the testimony of McDuff, so far as it relates to his conversation with Stone before the sale, and as to his statement after the sale, as reported by this witness, it was a complete repudiation of any such agreement for redemption as is set up by the plaintiff. His statement to

McDuff that "he was going to give Gillespie three months to redeem" the lots evidently meant, not that he was under obligation to do so, but that he and Gillespie were friends, and that he intended then to allow Gillespie to buy the property back. It is certain that he did give him three months, but it is not to be inferred from this that he intended to give him nearly eleven years.

Thirdly. The market value of the property purchased is of great importance in cases of this sort, since a great disparity between such value and the price at which it is bought has a very material bearing with a court of equity in reaching conclusions where evidence on the main points is inconclusive. And yet there is not a particle of testimony on this point from any witness on either side, except that given by the plaintiff and defendant. The plaintiff says the lots were worth, in 1863, from $700 to $1,000. The defendant says they were worth between $200 and $300. It is natural for a proprietor of land or lots, in a village, town or city to over estimate their value, and his opinion on such a subject would be an unsafe guide. It is the result of every one's observation that the owner of such property will fix a price on it, which he is himself aware he could not get from a purchaser at private sale, and much less when sold involuntarily under the hammer of the auctioneer. Hence, there is a class of persons whose business it is, in cities especially, to negotiate sales of real estate, whose opinions from their opportunities of being informed are usually relied on as important testimony on such matters; and where no such profession is practiced, intelligent neighbors, would be more likely to know the market value than the proprietor.

Some evidence was given in this case in regard to the value of this property at the trial and for three or four years previous, but that had no tendency to throw any light on its value in 1863, twelve years before. We know as a matter of history, that the value of such property in Milan, as well as elsewhere, was in a depressed condition

in 1863. But no testimony was given on the subject except that of plaintiff and defendant, and it devolved on the plaintiff to show that the estimate of defendant was materially erroneous. In such case, therefore, we can only assume that there was no material disparity between the market value of the lots and the price given by defendant. Indeed the fact admitted on both sides, that defendant refused to buy them at plaintiff's instance, at a price sufficient to extinguish his debt until Gillespie promised to relieve the lien on it, occasioned by Dr. Sand's judgment, is sufficient to show that in his opinion, upon which he acted, whether right or wrong, he was giving the full market value of the lots.

Fourthly. Assuming the agreement to have been as stated by the plaintiff, it must be understood as giving to him a reasonable time within which to redeem. No general rule has ever been attempted to be established as to what is a reasonable time in such cases. In this western country and in such a town or village as Milan was in 1863, great changes in the value of real estate may be expected in very short periods. In *Tatum v. Holliday*, 59 Mo. 426, it was observed that "where a constructive trust follows a sale and results in favor of parties, they must commence proceedings to redeem within a reasonable time;" nine years after the sale was held not to be such reasonable time. In the present case the suit was instituted ten years and six months after the sale. The statement of the plaintiff in regard to his conversation with defendant in 1868, is too vague and unsatisfactory and indefinite to form the basis of a conclusion that an offer to redeem was then made. He wanted, to use his own language, "to fix up the matter and try and pay him." That too, is contradicted by the defendant, who swears that Gillespie never mentioned the matter to him till shortly before the suit was brought, which was six years afterwards. And if the plaintiff was right in understanding the defendant as denying his right of redemption, why

delay the suit for six years? In this condition of the testimony on this point, we can see no authority in the court to fix upon any other point of time as the offer to redeem than the date of filing the petition, and we cannot regard ten years and six months after the sale as a reasonable time. The judgment must be reversed. The other judges concur, except Judge HENRY, who did not sit in the case.