REEL, *Appellant*, v. EWING.

| 71 | 17 |
| 111 | 215 |

**Equity :** ACTION TO COMPEL REDEMPTION : LACHES. The petition in this case alleged in substance that at a sale under a deed of trust given by defendants to secure the payment of a debt to plaintiff, the plaintiff, at the instance of defendants, purchased the property at the full amount of the debt, that plaintiff was induced to do this by representations made to him by defendants that the property was worth largely more than the debt, and a promise by them to redeem within thirty days, that the representations were false and fraudulent, that the property was worth much less than the debt, and that the promise had not been fulfilled. There was a prayer that defendants be compelled to redeem by paying the full amount of the debt. The evidence failed to show any promise to redeem, but showed at most that defendants had said they would endeavor to raise the money and take the property back within thirty days. It also showed that plaintiff had known the property long before the sale, that at the time of the sale it was worth more than the debt, that plaintiff took possession immediately after the expiration of the thirty days, and continued to treat the property as his own for two years before bringing this suit, that in the meantime the commercial panic of 1873 had occurred, in consequence of which this, like all other property, had greatly depreciated in value. *Held*, 1st, that plaintiff had never had a cause of action ; 2nd, that if he had ever had one, he had delayed too long the enforcement of his rights.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

*E. T. Farish* for appellant.

*Noble & Orrick* for respondents.

NAPTON, J.—The petition in this case was filed on the 16th day of August, 1875. It charges that the. defendants made their deed of trust to Robert A. Bakewell, of date May 30th, 1871, conveying a certain piece of land in

2—71

" Prairie Place" on St. Charles road, near the city of St·
Louis, in trust to secure the payment of seven promissory
notes:    One, a principal note for $8,000 at three years; and
the others, interest notes for $400 each, payable respectively
in six, twelve, eighteen, twenty-four, thirty and thirty-six
months after date; that the notes maturing at eighteen and
twenty-four months becoming due and remaining unpaid,
the said trustee, at the request of plaintiff, did advertise
said property for sale on the 12th day of July, 1873; that
very shortly before said day of sale the defendants, Ewing
and Eoff, represented to said trustee, as agent of plaintiff,
and to plaintiff, that said property was worth much more
than the amount of said debt, and that they were extremely
desirous to avoid a sacrifice of the same, and did earnestly
entreat said plaintiff and said Bakewell, not to sacrifice
the same by a forced sale, but to indulge said defendants
for a reasonable time, and did then promise said John H.
Reel, that if he, said Reel, would, at the said sale, purchase
the said property for the amount due on said notes, and
interest and costs, they, the said defendants, would, in thirty
days from date of said sale, pay to said plaintiff the full
amount of said notes then due, and interest and costs on
his executing to them a quit-claim deed for said property,
or causing a deed to be executed by said trustee to them
of the same; that said John H. Reel, the plaintiff, fully
believing the representations of said defendants in this be-
half, and taking their statements to be true as to the value
of said property, which they represented to be largely in
excess of said debt, and being desirous not to damage them
or sacrifice their property, but merely to secure the pay-
ment of his said debt, did, on the faith of the aforesaid
representation of said Ewing and Eoff, direct said trustee
to strike off said property at said sale to him, the said
plaintiff, at the amount of said debt and costs, and to exe-
cute no deed for the same until the expiration of said thirty
days; that, thereupon, the said trustee, at the request of
said Reel and said defendants, and on the faith of the said

promise and agreement of said defendants to said plaintiff, and, for the purpose of carrying out the same, did, on the day of said sale, strike off said property to said plaintiff at the price and sum of $9,100, being the amount then due on account of said debt and interest ($8,921) and $179 the estimated expenses of said trust; that at the expiration of thirty days the said defendants positively refused to carry out their said agreement and promise, and declined to pay the said sum and to receive said property, whereupon the said trustee who had already executed and acknowledged a deed for the same, with the name of the grantee in blank, did, on the 12th day of August, 1873, deliver said deed to said John H. Reel, who caused the blank therein to be filled up with his own name, and recorded the same.

Plaintiff says that, relying upon the false representations of defendants, he did always, until the defendants refused to carry out their agreement as aforesaid, believe said property to be worth much more than the amount of said debt; that he was completely deceived and thrown off his guard by the false and fraudulent representations of defendants in this respect, and by their false and fraudulent pretense that they were afraid to have the property sacrificed at a forced sale, and by their entreaties to him to save the property to them by purchasing it as aforesaid and holding the same as aforesaid for thirty days for them; and that but for said false and fraudulent representations and pretenses which were made, as plaintiff avers, by defendants, for the purpose of defrauding plaintiff and leading him to bid at said sale the amount of said debt, he would not have purchased said property at said sale; that there was no competition and no bidding whatever at said sale, said defendants purposely absenting themselves therefrom for the purpose of carrying out their fraudulent purpose to shove off said property on plaintiff for their debt to him, and in accordance with their agreement with plaintiff that he should purchase the same.

Plaintiff says that on the day of said sale the said

property was not worth more than $5,000, and is not now worth that sum; that he made said loan on the faith of defendants' representations that the same was worth largely over $10,000, which defendants well knew to be false, and that relying upon the said representations of defendants, and fully believing the same, he did at said sale purchase said property to hold in trust for them, and not otherwise, fully believing that upon the expiration of said thirty days defendants would pay to plaintiff said debt, interest and costs.

Plaintiff says that said notes of defendants, to-wit: said note for $8,000 and the ones last maturing of said interest notes, are still in the hands of plaintiff unsatisfied; that in pursuance of said understanding with, and direction of, defendants, and only because thereof, plaintiff bid in said property, and now and ever since has held the same in trust for said defendants, and is ready and willing, and has always been ready and desirous to convey the same to defendants upon their compliance with their agreement as aforesaid, and has offered so to do; but defendants have refused and still refuse to accept said property and pay the bid so made for defendants by plaintiff. And plaintiff now offers to convey to defendants the property acquired by said sale, by good and sufficient deed, upon their compliance with their promise and undertaking. as aforesaid. Wherefore plaintiff prays that defendants be adjudged and decreed to pay plaintiff said sum of $9,100, with interest from the 12th day of July, 1873, with costs, and for such other and further relief in the premises as may be equitable and just.

The answer of defendants is a specific denial of each allegation in the petition.

There was a judgment for plaintiff in the circuit court, which judgment was reversed in the court of appeals, and the case is brought here by the original plaintiff, Reel.

To a correct understanding of the merits of this case, a statement at least of the substance of the evidence is

necessary, and for this purpose, Judge Bakewell being the principal witness for plaintiff, and in fact the plaintiff's agent or attorney in the transaction complained of, we copy the printed condensation of his testimony, made by the plaintiff's attorney, Mr. Farish, the partner of Judge Bakewell until his transfer to the bench.

Judge Bakewell testifies that whilst the advertisement was in the paper, and before the day of sale, defendant Eoff came into his office and stated that this was a very hard case upon himself and Mr. Ewing, that they did not want the property sacrificed, that the property was valuable, and that they did not want to have it sold in that way without having time to look around and secure themselves by protecting the property. He asked him to act as his friend in this matter, and see that nothing of that kind was done. Bakewell then told Eoff that as far as that went it was unnecessary for him to be present at the sale at all; that if they desired it to be so done the property should be bid off for the amount of the debt, costs and interest. Eoff then said that if Bakewell would do that, Ewing and Eoff would endeavor to raise the money and let him, Bakewell, have it, and take the property within a month, that is, pay the amount within a month if that was done. The impression given Judge Bakewell by Eoff was, that here was valuable property which largely exceeded the loan, that they wanted to have time to arrange the matter, and that it was understood, as a matter of favor to defendants, that they were to have a month, within which time they were to raise the money and pay Bakewell. In pursuance of this arrangement, Judge Bakewell having every confidence, and imposing reliance upon Eoff, whom he had known in former years as a neighbor and with whom he had been socially intimate, employed an auctioneer, Mr. Papin; told him of the arrangement; instructed him as to the amount to bid; never attended the sale. There was no one present at the sale but Papin and the two defendants, no bidders

and the property was bid in by Papin, in the name of plaintiff, for the amount agreed upon.

But for the understanding Bakewell had with Eoff, he would have attended the sale and protected plaintiff's interests, and bid it in as cheaply as he could. Eoff wanted Bakewell to act as his friend, for him and Mr. Ewing in this matter, and see that the property was not sacrificed, and to give them a month's time in which to raise the money; in which to do whatever they wanted to do, raise the money to pay Reel; Reel wanted the money. I understood from what they said that the property was worth a great deal more than the loan, that they had been taken a little short about the matter, but they would look around, and make another loan, and raise the money in some way. Bakewell says he knew nothing about the worth of the property, but the impression made on his mind by Eoff was that the property was worth a great deal more than the loan.

The scope of the conversation I had with Eoff was this: That I was not to knock the property off for a nominal sum, so that Reel would get the property; and that if I would hold it a month, there was no question about it but they would raise the money and pay off the notes. The conversation was conducted on this theory, that here was property worth a great deal more than the loan, and it would be a big thing for Reel if he got the property, and that was exactly what the defendants did not want him to do—to get the property for the loan; that here was a case where Bakewell had the power, that Reel was in the country and there was no way of communicating with him directly; that the property was worth a great deal more than the loan; that it was a hard thing that the property should be knocked down for that amount, and that defendants should lose it, when, if they should raise the money, they would have a big margin, and if it was not paid in thirty days, deed to be taken in John Reel's name.

When Bakewell, at the end of thirty days, Ewing and

Eoff declining to pay the money, inserted Reel's name in the deed, he still thought from what defendants told him, that it was a hard case on them, that the property was worth more than the loan. Eoff made me believe that the property was worth a great deal more than the mortgage. I thought I had waited on Eoff as long as I could, in justice to Mr. Reel, and Eoff and Ewing were very sorry that they could not pay it, that they could not help themselves, and it had to go; then without consultation with Reel, thinking that the property was ample security, I recorded the deed.

After that, he, Bakewell, thought he had been the victim of complete misrepresentation, which had been palmed off on him under the guise of old friendship. This was when he ascertained the property was not worth the debt.

The other evidence is condensed in the printed brief of respondent, and having examined it in detail in the record, I have found it to be substantially correct, and it is, therefore, inserted here.

John H. Reel, the plaintiff, testified: Was informed by Bakewell and Farish that Ewing, Eoff and Riley wanted the money, and what property they offered as security; something was said about the value of the property and the security that was offered, but I paid no attention to that then; at the time of the loan I knew what the Prairie House was; I had passed it often, and knew what the building was; it is on the St. Charles Rock Road—a brick house. I took the deed of trust and notes down to Messrs. Bakewell & Farish's office, a short time before the trust sale. Ewing, before the sale, told me to have the property bid in for the amount of the indebtedness, and he would return it in thirty days; and, consequently, I instructed Messrs. Bakewell & Farish to bid it in. After the expiration of the thirty days, when the property was mine, and the deed was made to me, then I went to see about it; I went out to look at the place, to see what it was; when they told me they wouldn't redeem it, of course then I consid-

ered it as mine, and wanted to see what I had got for my money; I found a large house, in a very dilapidated condition, and found a gentleman there.

He placed the property in hands of Bartling, Chambers & Walsh, at one time, for sale, and afterward with Conn & McRee. It took him some time to put out the tenant, whom he found in possession, after he obtained the deed. He has paid taxes and insurance on the property continuously since delivery of the deed and received rent. At the time of the loan, neither Ewing, Eoff nor Riley made any representations to him about value of the property; took possession of the property just as soon as he got the tenant out. "I told the attorneys to get possession as soon as possible—they advised me to do it." Waited two years before bringing this suit, because he didn't like to go to law, and concluded to put up with it until advised by his attorneys to bring suit; he treated the property as his own since delivery of deed, rented it out, received rents and offered it for sale. On February 8th, 1875, Reel wrote the following note to M. P. Sanguinet & Co.:

" Gents: In reply to yours of the 5th, I will sell the Prairie House, 70x192 feet, the same property that I bought of Auguste Ewing & Co., for the sum of $10,000, one-third cash, the balance in two and three years, with interest at six per cent. on deferred payments.

" JOHN H. REEL."

Did not consult either Ewing or Eoff before making above offer.

Theophile Papin, for plaintiff, testified that he had the property knocked down to Reel, at request of Judge Bakewell, and, on cross-examination, said he thought that, on the 13th day of July, 1873, the property was worth ten or twelve thousand dollars.

Luther H. Conn: Does not think the property sufficient security for loan, but never at any time inspected the building; took possession for Reel in summer or fall of 1873.

E. G. Obear testified for defendant, that, in May, 1871, he was called upon as an appraiser to inspect the property thoroughly and give it a valuation. He did so, and appraised it at that time at about $17,000. Marcus A. Wolff and some body else were with him, and $17,000 was the value of it at that time, and don't think it depreciated any up to August 12th, 1873.

Wm. C. Eoff, one of the defendants, denied that he made any agreement to redeem the property. In July, 1873, when the loan was made, he thought the property was worth $14,000 at least. He, Ewing and Riley were securities on the bond of Mr. Branham, and in a suit against them—in which the value of this particular property was the subject of investigation in a proceeding in the probate court of St. Louis county, the case was referred to Judge Rombauer. He made his report, wherein he found that this property (July 8th, 1872,) was worth $14,000, and we, as securities, were held liable for this amount. He was in court when Judge Rombauer made the report, and knew at the time what valuation he had placed on the property; thinks, therefore, he had good reason for believing it was worth that amount, and now thinks it was worth that amount in May, 1871, and August, 1873.

Auguste B. Ewing, the other defendant, denied that he made any agreement to take the property within thirty days, but said that Reel told him that he would buy the property, and they might redeem it within thirty days if they wished; was interested, through his wife, in the Eddy suit against Branham, and knew of the report of Judge Rombauer before he ever had any conversation with Mr. Reel about the property, and also knew the property, and thought that the property, in July, 1873, was worth more than the amount of the mortgage; received the letter from Mr. Reel in June, 1873, demanding payment of the notes.

R. H. Betts, real estate agent, testified that he negotiated the loan after making personal inspection of the

property. From July, 1872, to August, 1873, this property was worth $15,000; during the panic of 1873 (in the fall) decreased in value twenty or twenty-five per cent., at least, and such decrease continued down to August, 1875.

M. P. Sanguinet testified : Real estate agent since 1859, and inquired into the value of this property from May, 1871 ; testified before Judge Rombauer, in the Eddy suit, as to the value of this property; it was worth then $14,000 or $15,000, and down to July, 1873, there was no change in its value, except the usual wear and tear of the improvements; during the panic of 1873, middle of September, 1873, down to July, 1875, this property declined in value from twenty to thirty-five per cent. ; received the note from Mr. Reel, in evidence, dated February, 1875, offering to sell it at $10,000. After the party to whom he wished to sell looked at the property, he declined to pay over $7,000 or $8,000 for it, because the house was in a worse condition than he supposed.

Marcus A. Wolff testified : Very familiar with the property, live out west of it, and pass by it about 300 times a year ; at request of the Eddy children, examined it in the year 1871, and during that year testified before Judge Rombauer as to its value. I valued it then at $12,225 ; there was no change in its value to amount to anything down to August, 1873 ; if anything, it was worth a little more in August, 1873; since August, 1873, the property has depreciated in value, the place has been neglected, and looks a good deal worse than when Mr. Branham was there in 1873, and do not think the property is now worth over $10,000; could have got for Mrs. Branham $1,800 a year rent for the property. It is a good, large house, substantially built. .

This was in substance all the evidence. We have had occasion, during the present term, in the case of *Gillespie v. Stone*, 70 Mo. 505, to consider many of the questions involved in the present case. It is true, that the case of *Gillespie v. Stone*, in its facts, is just the converse of this. That

was a suit by the debtor to be allowed to redeem, upon an alleged agreement with the creditor that he might have an indefinite time for redeeming, whilst this is an action by the creditor to compel the debtor to redeem, after the expiration of the thirty days which it is alleged were allowed him. Both petitions are, however, based upon allegations of an implied trust, growing out of alleged fraudulent representations which prevented competition at the sale, and, therefore, involve the same general principles.

The first thing that must strike any one on reading this testimony is, that there was no agreement proved that the defendants would take the property at the end of thirty days. Eoff and Ewing both deny it in their testimony, and Judge Bakewell does not assert it. The latter states his recollection of the conversation with Eoff to have been, that they would like to have a month to look around and would endeavor to raise the money and take the property. Judge Bakewell readily acceded to this, being under the impression, produced by Eoff's representations, that the property greatly exceeded the amount of the debt in value at that time, which was the 12th day of July, 1873. But on the expiration of the thirty days, which was the 12th day of August, 1873, ascertaining that defendants declined to buy, he inserted his client's name in the deed and had it recorded, and Mr. Reel took possession forthwith. It was immediately after this that Judge Bakewell discovered that he had been imposed on, as he supposed, but his client, the plaintiff, not only took possession, rented it out and paid the taxes, but nearly two years afterward authorized a land broker to sell it, as his property, for $10,000. Suppose, after this affair was thus closed in the last of July, no commercial "panic," to which the witnesses refer, had occurred in the middle of September, 1873, striking down the value of this and other real estate from twenty to thirty-five per cent., and that, on the contrary, such property had increased in value to the same extent as it in fact decreased, what claim, in a court of equity, would the de-

fendants have had for a conveyance to them, after the expiration of the thirty days? The "panic" occurred a month after the final conclusion of the defendants, on the 12th day of August, not to take the privilege granted to them by plaintiff, and the plaintiff concluded to take the property at the price he bid. It is clear that, without proof of fraudulent representations, or rather misrepresentations, there was no case, and we concur with the court of appeals that there was not the slightest evidence of any fraud on the part of the defendants. The truth seems to be that the plaintiff was better acquainted with the property than either of the defendants. He had passed the "Prairie House," which was the property in controversy, ever since he was old enough to ride on horse-back. The only information either of the defendants had concerning the value of the property, so far as the record shows, was what they heard from others, and more particularly what they heard in a proceeding in the probate court, in which the value of this property in 1872 became a very material question to them as securities for one Branham, in which proceeding Judge Rombauer, to whom the matter had been referred, after examination of experts, reported the property as worth $14,000, and they were charged accordingly. This estimate exceeded the debt ($9,100) by nearly $5,000. That under such circumstances, the representation of Mr. Eoff to Judge Bakewell should be regarded as fraudulent, or, in other words, a deliberate contrivance to mislead, is not to be thought of.

But judging from the testimony in this case, these opinions or representations of Mr. Eoff were not only not fraudulent and honestly entertained, but in point of fact they were correct. All the real estate dealers who were examined at the trial agreed in this, except Mr. Conn, who had never examined the property, and whose opinion is very much weakened by its going so far as to say that it never was worth the loan on it in 1871; that is, that it was not, in 1871, worth $8,000. The probate court, however,

Reel v. Ewing.

upon the report of Judge Rombauer, based on an examination of all the prominent real estate brokers in the city, declared it worth in 1872 $14,000. · Mr. Conn ·may be right and the court and Judge Rombauer and the other real estate brokers wrong, but courts must act in such cases upon the great preponderance of the evidence submitted to them. Besides, it is pretty clear that the plaintiff acted himself on these opinions. After he bought the property and ascertained that the defendants had declined to redeem, he waited two years before bringing suit and regarded the property as his absolutely, after as well as before the "panic." He was not certain how it would turn out. Panics are sometimes short-lived. True, the plaintiff alleges as an excuse for not suing that he disliked to go to law, which is not an unreasonable excuse with a sensible man ; but why this excuse should not have been as effectual in 1875 as in 1873, does not appear.

Upon the whole, we think the proof of any agreement on the part of defendants was not established. At their request, as an act of courtesy, thirty days were allowed in which the plaintiff consented they might redeem. There was no fraud practiced or misrepresentation made to induce this extension, and we might further say that there was no proof, other than speculative, that any ·competition was prevented by it, had both the preceding propositions been established, and we might add that two years was too long to wait before taking any steps whatever after the supposed discovery of the alleged frauds. The judgment of the court of appeals is affirmed. The other judges concur.