Harness v. Cravens.

## HARNESS v. CRAVENS, *Appellant.*

### Division Two, December 22, 1894.

1. **Action for Back Taxes:** ORDER OF PUBLICATION: JURISDICTION: JUDGMENT. Where in a suit for back taxes the petition and accompanying affidavit allege defendant's nonresidence, but no order of publication was taken out, as authorized by Revised Statutes, 1889, section 2022, but instead a summons was issued, as provided for by sections 2013, 2023, against resident defendants only, which was returned *non est* and an order of publication based on the latter return, such order of publication was not warranted by section 2024 which provides that when summons has been properly issued and return of *non est* made, the court, being first satisfied that the defendant can not be found, may make order of publication as required by section 2022; the order of publication so issued in this case was a departure from the allegations of the petition and the affidavit and jurisdiction of the defendant was not obtained and the judgment foreclosing the tax lien is invalid.

2. **Practice:** PROCESS: JURISDICTION. Where a mode of securing jurisdiction differing from that of the common law is prescribed by statute, nothing less than a rigid and exact compliance with the provisions of the statute will confer jurisdiction.

3. **Summons:** RETURN: JUDGMENT: RECITALS. A recital of service of process contained in a judgment may be contradicted in a collateral proceeding by showing from the record that legal service was not made.

4. **Void Judgment:** SALE: TITLE OF PURCHASER. One purchasing land at a sale under an execution issued on a void judgment acquires no title.

| | |
|---|---|
| 126 | 233 |
| 63a | 6 |
| 126 | 233 |
| 132 | 457 |
| 132 | 668 |
| 132 | 680 |
| 126 | 233 |
| 138 | 232 |
| 126 | 233 |
| 143 | 510 |
| 74a | 675 |
| 75a | 262 |
| 126 | 233 |
| 146 | 430 |
| 146 | 520 |
| 150 | 327 |
| 126 | 233 |
| 87a | 178 |
| 126 | 233 |
| 172 | 1 92 |
| 174 | 4 303 |

5. **Taxes, Tender of:** DISCHARGE OF TAX LIEN AND JUDGMENT. Where a nonresident landowner calls on the collector for the amount of taxes due on his land and offers to pay the same, such offer should be regarded as a tender, and if the amount demanded by the collector is paid, it will operate as a discharge of the tax lien, and this is as true of a judgment lien as of any other tax lien. Revised Statutes, 1889, sections 7606, 7679, 7681.

6. ———: ———: TAX DEBT. Such discharge of the tax lien would not, however, release any taxes remaining due as a debt, and they could still be sued for and recovered.

7. **Tax Sale:** PURCHASER: NOTICE OF IRREGULARITIES. The attorney of the plaintiff who becomes the purchaser at a sale under execution on a judgment for back taxes is chargeable with all irregularities in such proceeding.

8. ———: EXECUTION DEFENDANT: NOTICE: MISNOMER. The designation of the defendant in the notice of sale of his land by the sheriff on execution under a judgment for back taxes as "Horners" instead of "Harness," his true name, renders the sale thereunder void as to one purchasing with notice of the irregularity.

9. ———: EXECUTION: NOTICE TO DEFENDANT IN ANOTHER COUNTY. Where the execution on the judgment in a back tax suit is issued to the sheriff of the county in which such judgment was obtained, it is not necessary that notice be given to the execution defendant residing in another county of the issuance thereof, as provided by section 4943, Revised Statutes, 1889.

*Appeal from Jasper Circuit Court.*—HON. M. G. McGREGOR, Judge.

AFFIRMED.

The plaintiff lived in Barton county; had lived there some seventeen years, having previously lived in Newton county five years or more on a farm, all in cultivation. That farm consisted of a piece of ground, to wit: The southwest quarter of the northeast quarter and the west half of the southeast quarter, less ten acres off the west side thereof (seventy acres), all in section 7, township 24, range 29. The portion in litigation is the seventy acres, which has a house and orchard on it.

The plaintiff was well known among his neighbors in Newton county at the time he resided there, and, when this cause was heard, was nearly eighty-two years of age and wholly illiterate not being able to read his tax receipts.   Since leaving his farm and removing to Barton county he has had his farm continuously in cultivation, and, with the exception of one summer, continuously occupied, one of his sons having lived on the place four or five years.   Plaintiff paid for the farm $25 per acre, and the seventy acres was estimated to be worth some $2,400.

Though living in Barton county some fifty or sixty miles distant from Neosho, the county seat of Newton county, the old man made occasional trips to the county of his former residence, and while there on one of these visits in August, 1888, he went to the collector's office and asked to *"pay all taxes against him"* on his land, against that land that he owned, the one hundred and ten acres, and Bailey P. Armstrong, the then collector, looked up the land, on being told where it was, and Harness *"paid all he fetched forward."* Having paid his taxes, the collector gave him a tax receipt for the year 1887.

In March, 1889, Harness paid the taxes on the land for the year 1888, and took a receipt therefor, from Gracy, the collector in the tax suit controversy, and when in the collector's office on that occasion, Harness says he "called for all the taxes against the land." That suit was begun September 14, 1889, and was for the taxes on the land for the year *1886*, a duly certified tax bill accompanying the petition, which alleged defendant to be a nonresident of the state.   An affidavit as to nonresidency was also made.

On the filing of the petition a *summons* was issued, and the sheriff having returned *non est* on the writ, publication was made, etc.   Judgment was rendered in the

suit thus instituted, July 11, 1891. Execution was issued August 24, 1891, and on September 24 next thereafter a sale of the land in controversy occurred, at which defendant became the purchaser at the price of $25.

Harness was unaware of any taxes being due or of any suit having been instituted against him for taxes on the land in controversy, and did not know of the sale until in the subsequent December, when a friend wrote him a letter concerning it. Between the time of the rendition of the judgment and the sale of the land, Dry, a tenant of Harness who lived on the litigated land, happened to be in the collector's office to pay taxes on Gentry's land, Gibson being then collector. While there, witness says, "Gibson spoke to me and asked if I knew anything about the Harness land, and I said yes, that I had rented it. He says, 'Do you know anything about who pays the taxes on it?' I says, 'Yes, Isaac Harness himself.' He says, 'Do you know where he resides?' I says, 'Yes, he lives in Barton county and Milford is his postoffice.' And then I told him I knew Harness didn't know anything about this tax or he would pay it. And he said he would notify him. I says, 'If you will make a statement of that tax I will see that he gets it.' I then sent Mr. Harness the statement given to me by the collector, Mr. Gibson. I did not ask the collector for the statement, he gave it to me voluntarily and I did not ask about any back taxes on the land." This was in the early part of October, 1891.

On this point Gibson testified: "That statement showed the taxes due on the southwest quarter of the northeast quarter of section 7, township 24, range 29, for years 1886 and 1889 and also seventy acres west half southeast quarter less ten acres section 7, township 24, range 29 for 1889. * * * I ascertained the

amount of taxes shown in the statement sent to Harness from the 'Consolidated Back Tax Book' of 1890 and prior years of Newton county, Missouri. That book was delivered to me by the county clerk; was in my office and custody and showed all the taxes against the land in suit *which appeared in that book.* And that book was the only one in my office that showed the delinquent taxes for the year 1890 and prior years. That book showed all the back taxes for all the years prior to and including the year 1890. In cases where suits had been instituted by my predecessor, undisposed of at the time I came into office, they were carried forward and shown by that back tax book and the suits marked. *The book did not show any suits against this seventy acres.* C. H. Brown & Co. paid the taxes shown by the statement gived to Dry. (See exhibit A.) On November 4, 1891, I wrote them a letter marked exhibit B. and received response, marked exhibit C. I paid the money enclosed therewith to J. E. Hinton, circuit clerk, and got receipt, marked exhibit D. This paid all the back taxes shown on the books in my office against the land in controversy. Gracy was my predecessor in office, and all I had to do was to collect the tax money due on suits he had brought. The back tax book for the year 1890 and prior years, although it showed a suit for taxes against the forty acre tract, the southwest of the northeast for the year 1886, did not show that Isaac Harness was a party to that suit. All the land described in exhibit A was assessed to *William* Harness." Gibson testified that he had known the "Harness land" for fifteen years. Never knew about tax suit until land sold.

The exhibits referred to were as follows:

### EXHIBIT A.

"LAMAR, Mo., October 30, 1891.
"*Collector Newton Co., Neosho, Mo.*

"DEAR SIR:—Enclosed find draft for $25.50 sent by request of Isaac Harness to pay tax sw ne 7-24-29, 1886-1889. 70 acres w ½ se 1889. This is according to a statement sent him. Yours,

"C. H. BROWN BKG. Co.,
"R. P. Smith, Prest."

### EXHIBIT B.

"NEOSHO, Mo., November 4, 1891.
"*Mr. C. H. Brown.*

"DEAR SIR:—I received a draft for $25.50 to pay taxes for 1889 and 1886. The statement given to the man that lives on the Harness place did not include the cost of a suit pending for taxes on sw ne for taxes for 1886. The cost of suit is $26.25 and taxes for 1889 amounts to $25.50. Total amount $51.75. The land will be sold for taxes next week at the circuit court of Newton county. Please let me know what course to pursue in regard to it.

"Respt.,
"W. F. GIBSON, County Collector."

### EXHIBIT C.

"LAMAR, Mo., November 9, 1891.
"*W. F. Gibson, Esq., Neosho, Mo.*

"DEAR SIR:—Your favor of the 4th rec'd. In answer, at request of Isaac Harness, I enclose draft $26.25 as per your statement of costs due on sw ne for year 1886. Mr. Harness says he will be down soon, but he did not know that his tax was back.

"Yours, R. P. SMITH, Prest."

EXHIBIT D.

"Neosho, Mo., November 10, 1891.

"Received of C. H. Brown the sum of twenty-six and 25-100 dollars, being in full of costs in circuit court on suit for taxes against the following described land to wit: sw ¼ ne ¼ s. 7, t. 24, r. 29.   Costs in full $26.25.   The taxes having this day been paid, as appears from tax receipt presented to me by said . . . the suit above mentioned is therefore dismissed.

"J. E. Hinton, Clerk.

"By J. A. Jackson, D. C."

Another tax receipt signed by Gracy for taxes for year 1890, dated January 6, 1891, on the land in suit, was read in evidence by plaintiff.   The date of the last mentioned tax receipt was only about three months before publication made in the suit now under discussion, in which Gracy was a party plaintiff.   The testimony also tended to show that Gentry, a neighbor of Harness, had paid the taxes on the land in suit for the year *1886* for plaintiff, and had taken a receipt therefor, which tax receipt plaintiff gave to Sparkman, and gave him the money to pay plaintiff's taxes. This was in the early part of the year 1888; but Sparkman ran off, and so plaintiff lost both money and receipt.

Plaintiff also introduced in evidence county court records of Newton county, Book G, page 138, showing the action of the county court of Newton county, March 8, 1887, relative to the delinquent list for the year 1886; which record was as follows: "Now on this day comes B. P. Armstrong, collector of the revenue of Newton county, to make his annual settlement as collector, and presents his delinquent list for which he is allowed credit as follows:   (Here follows

on the record a tabulated statement showing the aggregate amount of the delinquent list and the total amount of double assessments.)'' It was admitted that was all that appeared of record. in relation to the delinquent list of 1886. There was no record showing that the county court had made any examination or correction of the delinquent list, or that it directed the list to be certified and filed.

Upon receipt of the sums mentioned in the exhibits Gibson, on November 10, 1891, entered the fact of payment opposite the tracts on which payment had been made, on the back tax book for the year of 1890 and prior years. And after that nothing on that book showed any taxes to be due on the land. now. in question.

On hearing of the sale of his land, plaintiff applied to defendant for permission to redeem it, but defendant refused to do so, whereupon plaintiff instituted the present proceeding, in January, 1892, to cancel the sheriff's deed made to defendant as aforesaid, as a cloud on plaintiff's title and for other and further relief.

Among the grounds mentioned as basis for the relief sought, were that plaintiff was sued as a nonresident of the state, when for over twenty years at that time he had been a resident thereof; that there were no taxes due on the land for the year 1886, as claimed in the tax suit; that plaintiff had no knowledge or notice of the suit, nor of the sale made thereunder until after the sale occurred; that publication was made against him as a nonresident; that the alleged tax bill was not a valid one; that there was no valid back tax book, nor any legal delinquent list from which to make and certify the tax bill on which to base a suit for back taxes; that at no time did the county court of Newton county examine and compare any

delinquent list for the year 1886, nor could any such delinquent list be certified and filed in the office of the clerk of the county court; that long before the sale of said land for taxes, plaintiff had gone to the collector of Newton county and asked to be permitted to pay to said collector all taxes due on said land; that thereupon said collector made examination of the tax books in his office and gave plaintiff a written statement showing that the only back taxes due on said land were for the year 1889, which taxes plaintiff paid and took a receipt therefor, and the collector entered proper credit therefor on his tax books, which were the only taxes then remaining due and unpaid on said books, nor was there any other tax due on said land; that defendant became the purchaser of said land with full notice and that he was the attorney of the tax collector, Gracy, by whom the tax suit was instituted, etc., etc.

Defendant's answer was, in effect, a general denial. The lower court, on the facts aforesaid, found the issues and entered a decree for plaintiff, allowing him to redeem on payment of the $25 and interest, and also found that plaintiff was a resident of Barton county, Missouri; that the only process in the case was an order of publication; that plaintiff had no actual notice of the suit; that plaintiff applied to the collector for a statement, which was furnished him, and plaintiff paid all the taxes shown by such statement to be due, and that there was nothing in the collector's office showing any judgment had been obtained against the land, nor was there any reference to any such judgment in the statement furnished plaintiff; that there were other irregularities in regard to the returning the delinquent list and noncompliances with the law, and of the record therein of the county court; that defendant was attorney for the tax collector and

brought suit for the taxes in question, recovered judgment and bought in the land of plaintiff for $25; that plaintiff was in possession of his farm by his tenant, was well known in that neighborhood, and should have been served with personal process; that in the notice of the sheriff's sale the plaintiff was mentioned as "*Horners,*" instead of *Harness;* that the tax sale was, therefore, irregular; that, in consequence of these irregularities, defendant was not an innocent purchaser, etc.

*E. O. Brown, Joseph Cravens* and *O. L. Brown* for appellant.

(1) Defendant's objection to the introduction of evidence on the part of plaintiff, under the allegations in his petition, should have been sustained in the court below. The matters pleaded by plaintiff and attempted to be proved on the trial, or some of them, perhaps, might have been proper subjects of defense in the original tax suit, but certainly not to set aside and annul a sale and deed based on a valid judgment rendered after all the forms and requirements of the law had been complied with, and after the taxes on this land had taken the form and effect of a judgment, the sale can not be attacked on any of the grounds mentioned in the petition. *Raley v. Guinn,* 76 Mo. 343; *Payne v. Lott,* 90 Mo. 676; *Schmit v. Niemyer,* 100 Mo. 207; *Jones v. Driskill,* 94 Mo. 191. (2) It was the duty of plaintiff to pay all his taxes, and he can not excuse his neglect by charging it upon the collector. (3) There is no evidence in this case showing, or in the remotest degree tending to show, that Collector Gracy or defendant, as his attorney, at the time the tax suit was brought, or at the time of the sale to defendant, knew that plaintiff lived in Barton county or in the state. The law was

fully complied with so as to give the court full jurisdiction. A summons was duly issued to the sheriff of Newton county and a *non est* return was made thereon. In addition to that, the petition in the tax suit, verified by affidavit, alleged that plaintiff was a nonresident of the state. To require more than this, would be to require an impossibility. *Jones v. Driskill*, 94 Mo. 191. The fact that Harness lived in Barton county does not affect the judgment or sale under it. *Payne v. Lott*, 90 Mo. 676; *Schmit v. Niemyer*, 100 Mo. 207; *Stephens v. Howard*, 14 Mo. App. 250, and authorities cited. Gibson was the collector called on for the statement and not Gracy, and plaintiff being, as he says, a resident, the statute did not require Gibson to furnish a statement, even if this defendant can be charged with Gibson's negligence. R. S. 1889, sec. 7606. Back taxes were not called for and no statement given. This defendant is not responsible for such "irregularities." *Raley v. Guinn*, 76 Mo. 263. It is stated that there were irregularities in the returning of delinquent list, but the record of the county court shows a full compliance with the law. *State ex rel. v. Hurt*, 113 Mo. 90. (4) Complaint is made that plaintiff was not notified of the sale sought to be set aside, that is, his name in the notice of sale was spelled "Horners" instead of "Harness." This objection is not good. The statute does not require such notice. See sec. 4941; R. S. 1889; *Harrison v. Cachline*, 35 Mo. 79. Besides Revised Statutes, section 4943, it requires notice to be given to defendant when his real estate, situated in a different county from that in which the defendant resides, is sought to be sold under execution, does not apply where the judgment was rendered and the execution issued in the county where the land is situated. *Lohman v. Stocke*, 94 Mo. 672. (5) The court found that the advertisement of sale was in the name of

"Horners" instead of "Harness." No aspect of this finding is based upon any allegation of the petition on which this case was tried. That pleading sought no relief on account of the mistake in the plaintiff's name and contained no such allegations and not embraced within the special findings made by the court. On the contrary, the action of the court in that respect is without support in the pleadings, no portion of which is referable to mistake in plaintiff's name, so that in any event the decree must be reversed. (6) There were no confidential relations existing between plaintiff and defendant whereby equity would refuse to permit defendant to purchase at the tax sale and profit by bid. The defendant had no control of the sale by the sheriff under execution and occupied substantially the same relation toward the sale as did other bidders present. *Wilber v. Robinson*, 29 Mo. App. 157; *Cowan v. Barret*, 18 Mo. 257; *Lewis v. Whitten*, 112 Mo. 318; *Stewart v. Severance*, 47 Mo. 366; Cooley on Taxation, p. 341, also 351; *Boyd v. Jones*, 60 Mo. 454; Blackwell on Tax Titles, star page 400; *Robinson v. Parker*, 41 A. R. 614. (7) The failure to carry forward the delinquent taxes on the land in controversy for 1886 on the "back tax book of 1890 and prior years" by the county clerk in making up the delinquent list of real estate is an "omission" which can not invalidate the deed to defendant. R. S. 1889, sec. 7705; *Raley v. Guinn*, 76 Mo. 263.

*H. C. Timmonds*, for respondent.

(1) The only question presented to this court, if any at all is presented, is, whether there is sufficient evidence to support the finding and judgment of the trial court. As appellant does not preserve the evidence and present it to this court, and as the court found the issues for the plaintiff, making a general

finding, this court will assume that all allegations of plaintiff's petition were duly proved. *Woodsworth v. Tanner*, 94 Mo. 124. (2) The following irregularities were in the tax proceeding against Isaac Harness: *First.* He was, and for about twenty-five years had been, a *bona fide* resident of the state of Missouri. Yet, plaintiff in the tax suit alleged him to be a nonresident of the state, and gave him only constructive notice by publication against him as a nonresident. He had no actual notice. *Second.* At the time of the tax suit and tax sale, Harness had a tenant residing on the land in controversy, and Harness was well known in Newton county. This land had been in the actual occupancy of himself or his tenants for twenty-three or twenty-four years. It was an improved farm, all under fence, with orchard and dwelling house. *Third.* Nothing on the books or records in the collector's office showed any delinquent or back tax against the land in controversy, for the year 1886; nor did anything in the collector's office show that any tax suit was pending against this land. *Fourth.* Harness paid to the tax collector every cent which appeared in his office against this land. *Fifth.* The sheriff's sale notice advertised the land as belonging to Isaac "Horners," not Isaac Harness. (3) It is the duty of the collector, when suit is commenced against any tract of land on the "back tax book," to note opposite said tract such fact, and also against whom suit has been commenced. R. S., sec. 7681. This was not done. There was not a scratch of a pen anywhere in the collector's office to show any tax suit against the land in controversy. In fact, the evidence in this case shows that there were no delinquent or back taxes against this land for the year 1886, upon which to base a tax suit. The "back tax book of 1890 and prior years" should have shown all back taxes for 1890 and prior years on this land, as well as all tax

suits commenced. R. S., secs, 7679, 7681. Neither this "back tax book" nor any other book or record in the collector's office showed any taxes on this land for the year 1886, nor any tax suit commenced against it. (4) When Harness paid to the tax collector everything which he knew of or could find on the books or records in his office, the lien of the state was thereby fully discharged, and the subsequent sale was fraudulent and void. *Hoge v. Hubb*, 94 Mo. 489. (5) Where gross inadequacy of price is coupled with mistake, accident or misapprehension, caused by the purchaser or others interested in the execution sale, or by the officer conducting the sale, equity will interfere and set aside the sale. *Cole County v. Madden*, 91 Mo. 586. Or, when the transaction discloses a state of affairs which shocks the moral sense or outrages the conscience. *Durfee v. Moran*, 57 Mo. 379. (6) Where there is an irregularity in the proceedings, neither the plaintiff nor his attorney can, on becoming purchaser under the execution, protect his title by showing that he was ignorant of the irregularity; and whatever rights and equities the defendant in the execution may assert against a purchaser with notice, he may also assert against the plaintiff or his attorney, whether either had actual notice or not. Freeman on Executions [2 Ed.], sec. 340. The finding and decree of the trial court was for the right party, and the judgment ought to be affirmed.

SHERWOOD, J.—1. As appears from the record in this cause, the plaintiff herein, the defendant in the back tax suit, was proceeded against as a *nonresident* of the state. The petition alleged his nonresidence, and so did the accompanying affidavit. But, instead of taking out *an order of publication* before the clerk in vacation as authorized by section 2022, Revised Statutes,

1889, *a summons* was issued to Harness returnable to the next November term. That summons was returned *non est*, October 25, 1889. This *non est* return was followed by an order of publication based on that return, and then judgment by default took place at the May term, 1891, followed by a sale and sheriff's deed to defendant Cravens, September 24, 1891.

As will be seen by sections 2013 and 2023, Revised Statutes, 1889, a summons in such cases is only authorized to issue against a *resident* defendant. And it is provided in section 2024 when that summons has been *properly* issued and return of *non est* made thereon, then the court, being first satisfied that the defendant can not be found, makes an order of publication as required in section 2022. Of course such an order of publication made in the circumstances mentioned would recite, among other things, the issuance of the summons, and the fact that the defendant *could not be found*, etc.; because the court could not make this class of publication unless "*in conjunction with the return,*" and it must be "*founded thereon.*" *State ex rel v. Finn*, 87 Mo. 310.

So that we have here presented a defendant sued as a *nonresident*, summons issued against him as a *resident*, and publication issued against him as a resident *who could not be found.* In short, the order of publication was a clear departure from the allegations of the petition and affidavit. The issuance of the summons was, therefore, unwarranted by the statute, and the publication, being based thereon, necessarily partook of the writ's inceptional infirmity, and this is so, because, in the language of Mr. Justice FIELD, "the court is not authorized to exert its power in that way." *Windsor v. McVeigh*, 93 U. S. 283.

This doctrine is abundantly established, that, where a mode of securing jurisdiction differing from that of the common law is prescribed by statute,

nothing less than a rigid and exact compliance with the statute is an indispensable requisite to obtaining jurisdiction. 1 Elliott's Gen. Prac., sec. 247. Thus in *Granger v. Judge*, 44 Mich. 384, CAMPBELL, J., says:

"Where cases and proceedings are not according to the usual course, and are special in their character, they are held void on slighter grounds than regular suits, because the courts have not the same power over their records to correct them. So, where there has been no personal service within the jurisdiction, the doctrine prevails that proceedings not conforming to the statutes are void. But this is on the ground that there has been no service whatever, and the party, therefore, has not been notified, in any proper way, of anything. The purpose of the statutory methods is to furnish means from which notice may possibly or probably be obtained. But, as a court acting outside of its jurisdiction is not recognized as entitled to obedience, the special statutory methods stand entirely on their own regularity, and, if not regular, can not be said to have been conducted under the statutes. The distinction is obvious and is not imaginary."

In a case which arose in Alabama, BRICKELL, C. J., observes: "The statute not only defines the cases in which the court may take jurisdiction of nonresident or absent defendants, but it appoints and orders the mode of proceeding against them, and declares the effect of the decree rendered, if they do not appear and defend. The jurisdiction and authority, like all jurisdiction and authority derived from, and dependent upon statute, must be taken and accepted with all the limitations and restrictions the statute creating it may impose. These restrictions and limitations the courts are bound to observe; they can not be dispensed with, however much they may seem to embarass, or however unnecessary they may seem to be in the

administration of justice in particular cases. The statute is in derogation of the common law, is an essential departure from the forms and modes a court of equity pursues ordinarily, and must be strictly construed. Proceedings under it must be closely watched, or it may become an instrument for the infliction of irreparable wrongs upon defendants to whom notice is imputed by construction." *Sayre v. Land Co.*, 73 Ala. 85.

On this point, Wade says: "As this manner of serving process depends for its validity more upon its strict conformity to the statute by which it is authorized than upon any inherent probability of its conveying intelligence of the impending suit to the party whose rights are to be affected, the fact that it has actually come to the knowledge of defendant can not be shown to supply any material deviation in the publication from what the statute prescribes. The statute, being in derogation of common law, is always strictly construed." Law of Notice [2 Ed.] sec. 1030.

This is the well settled doctrine of this court, as shown in numerous instances. Thus in *Stewart v. Stringer*, 41 Mo. 400, it was ruled that where the statute provides for constructive service of process, the terms and conditions prescribed for such service must be strictly complied with.

A striking exemplification of this principle is afforded by *Schell v. Leland*, 45 Mo. 289. There, the statute, 2 Wagner's Stat., p. 1008, sec. 13, was the same as section 2022, *supra*. There, the plaintiff, seeking to enforce a mechanic's lien, filed his petition and had summons issued in the ordinary way, which was returned *non est*. Thereupon he made affidavit before the clerk in vacation, of the defendant's non-residency, who, on such affidavit, issued an order of publication which was followed by a judgment. Speak-

ing of this proceeding and of its insufficiency, WAGNER, J., observed: "The order can only be made by strictly complying with the statute; for, in all cases where constructive notice is substituted for actual notice, strict compliance is required. The section contemplates and directs that the facts which authorize the publication shall be either stated in the petition, or an affidavit embodying them shall be filed at the commencement of the suit. This was not done in this case, and, therefore, no order was allowable in vacation under the foregoing section. The fifteenth section of the same act enacts that when, in any of the cases contained in the thirteenth section, summons shall be issued against any defendant, and the sheriff to whom it is directed shall make return that the defendant or defendants can not be found, the court, being first satisfied that process can not be served, shall make an order as required in the thirteenth section. But this section gives no countenance to the proceeding in the case at bar. It does not authorize an order of publication in vacation at all, but intends that it shall be made by the court at the regular return term. I conclude, therefore, that the publication was a nullity."

It will be noticed that the principal difference between the case just instanced and the one at bar, is that there the summons was issued *first*, returned *non est* and followed by the affidavit and publication, while here, the affidavit was made *first*, followed by the unauthorized issuance of the summons, return thereon, etc.

In *Quigley v. Bank*, 80 Mo. 289, an order of publication was held invalid because the affidavit against unknown parties, under the provisions of section 3499, now section 2027, was sworn to by the *attorney* for plaintiff, instead of by the *plaintiff himself*, that section requiring that the *plaintiff* should make the oath,

therein differing from section 2022, where the oath may be made by the *"plaintiff or some person for him,"* which difference was in that case pointed out.

So in *State ex rel. v. Staley*, 76 Mo. 158, where the petition did not set forth the interests of the unknown parties, nor did the order of publication do so, as required by section 2027, it was ruled that, in consequence, no jurisdiction was acquired over such unknown parties.

In *Charles v. Morrow*, 99 Mo. 638, a similar ruling was made in similar circumstances on the same section of the statute last aforesaid, and the principle was there reiterated that: "In all cases where constructive or substituted service is had in lieu of that which is personal, there must be a strict compliance with statutory provisions and conditions."

The more recent case of *Wilson v. Railroad*, 108 Mo. 588, confirms the views on this subject heretofore expressed in other cases: "Mere notice of service, not according to law, brings no one into court, nor does mere knowledge on the part of the party notified of the pending proceedings have any more valid effect. *Potwine's Appeal*, 31 Conn. 381; Smith, Merc. Law, 322."

Wherever proceedings are intended to result in an adjudication, and such proceedings differ from the course of the common law, a strict compliance with all material directions of the statute is essential in order to impart validity to the judgment. 1 Freem. on Judgments [4 Ed.], sec. 127.

"The judgment is based on the *service* as much as *subject-matter*. The petition simply says: I have a cause of action against the defendant. The law says: Notify the defendant of the proceedings and the court will hear you. Hence the notice must be given under the forms of law. Where it provides a form, or gives

direction as to the manner of service by publication, the statute must be complied with *strictly;* the direction is *mandatory.*" Brown on Jurisdiction, sec. 41.

It can not be doubted that the lower court would have been justified in disregarding the issuance and return of the summons, and in proceeding to order publication on the allegation of nonresidency; this it did not do; its whole action was based on the writ and its return, which course was wholly unsanctioned by the statute. On the contrary, right in the teeth of the allegations of nonresidency contained both in the petition and affidavit, the trial court made an order of publication adapted alone to the case of a *resident* who can not be found.

It will not do to say that the unauthorized order of publication would be *just as likely to apprise the then defendant of the suit against him as if he had been proceeded against according to the specific method prescribed by law*, because, if this were all that is required, then a printed *circular* or *letter* sent out by the clerk would answer the end and accomplish the purpose just as well. The *test is* was the *method* used in the given instance the one *prescribed by the statute?* If the answer is in the negative, that answer, without more, condemns the method employed, and announces its nullity. Whether that method actually notified the party, is of no importance whatever. The end of the law has been attained when, and only when, its forms have been observed. Wade on the Law of Notice, and Brown on Jurisdiction, *supra.*

Of course, if the order of publication, by reason of the facts aforesaid, is to be deemed invalid, then the judgment grounded thereon must share the same fate and fall with it. And the writ of summons and the order of publication, being part of the record, are competent witnesses of that judgment's invalidity, and by them it

can be impeached collaterally.  *Laney v. Garbee*, 105 Mo. 355, and cases cited; *Russell v. Grant*, 122 Mo. 161.

Since the judgment thus rendered must be regarded as null, of course the defendant acquired no title in consequence of the sale which occurred under the execution which issued on such judgment.  1 Freem. on Judgments, section 117.  On this ground alone, the decree should be affirmed.

2.  Section 7679, Revised Statutes, 1889, makes it the duty of the county clerk to place in a book to be called the "back tax book" a correct list in numerical order of all tracts of land on which back taxes shall be due in such county, setting forth opposite each tract of land the name of the owner if known, and if not known, then to whom the same was last assessed, the description thereof, the year or years for which such tract is delinquent, etc., etc.  Section 7681 makes it the duty of the collector when any suit shall have been commenced against any tract of land on said back tax book, to note opposite such tract such fact, also against whom such suit was commenced.  No such duties as these were performed in the case at bar.  As Gibson was elected in 1890 and took office in March, 1891, and as Gracy was his predecessor in office, it must have been the fault of the latter that the fact of the tax suit being begun at his instance in September, 1889, was not entered opposite the tract now in litigation.

One evident object had in view by the sections cited, is disclosed by section 7606, which makes it the duty of the collector to furnish all nonresident taxpayers (that is, those who live out of the county), on demand, a statement of the amount of taxes against any tract of land, etc., and send such statement by mail to any person applying to him by letter for the

same; and if no taxes are due on any such tracts, he shall answer such letters of inquiry, stating the fact.

In the present instance the back tax book in the custody of Gibson the collector, was for the year 1890; that book was entitled, and properly entitled: "Consolidated back tax book for 1890 and prior years," and it was the duty of Gibson to collect the taxes due in that book and to furnish all information in regard to taxes due or not due on land described in that book. And the fact that the collector, as here, volunteers to make a statement out of kindness does not at all diminish the legal force or probative efficacy of such voluntary statement.

The object of the law seems to be very plain; it is to furnish a source of *reliable information to the inquiring taxpayer;* so that when he receives a statement from the collector that such an amount is due on a tract of land, or that none at all is due, he can rely with all confidence on such statement, and when he pays the amount said by the collector to be due, he can set his mind at rest, seek no further, and be under the protection of the law. If this is not the meaning of the statute then it operates as a snare and pitfall for the unwary. In short, the calling on the collector for the amount due for the taxes on certain land and an offer to pay the same should be regarded as a *tender,* and if the amount demanded by the collector is paid, this should be regarded as a *discharge of the tax lien.* This is true of a tender when made in regard to a *mortgage* debt, even after the day fixed for payment, just as much as payment is, and in the same way that a tender at common law made upon the day named in the condition for payment has this effect. This is true in this state. *Thornton v. Bank,* 71 Mo. 22. This also is the rule in New York and Michigan. 1 Jones on Mortgages [4 Ed.], sec. 893.

No difference is perceived between the lien of a mortgage debt and the lien of a tax debt, even if the latter be clothed with the formality of a judgment, because a judgment lien may be discharged by the acceptance of a tender. 1 Black on Judgments, sec. 477; *People ex rel. v. Beebe*, 1 Barb. 379. Here the tender was both made and accepted, as well as the amount claimed to be due paid. The collector had as full authority to receive payment of judgment taxes as any other sort, and to enter satisfaction thereof. In fact he did so as to a forty acre tract not in dispute, as to which judgment had been rendered. This being the case, the judgment for taxes against the land in controversy must be regarded as occupying no higher footing, so far as discharging its lien is concerned, than any other tax lien.

In regard to ordinary tax liens, it has been ruled that, if the proper officer, authorized to do so, give a statement or certificate that there are no back taxes due, the purchaser applying for it is protected although the officer has erred. In such case the tax books not showing any tax to be due, the lien of delinquent taxes then existing, but not brought forward, could not be asserted against such purchaser, who took the land discharged of such lien. *Jiska v. Ringgold Co.*, 57 Iowa, 630.

In Pennsylvania, this case arose: The owner of land went to the proper office, to pay his taxes, and a list was made out for him, from which, by mistake, a road tax was omitted; he paid all the list called for, and it was held, in an action of ejectment, that, for all the purposes of a sale, this was equivalent to full payment; that the statement and receipt in that case, their correctness not being assailed, were clear evidence that the owner asked the officer for the taxes due by him, and paid all that was demanded, and that after

this was done, the owner was not bound to take notice of subsequent steps to a sale, and the sale was without jurisdiction. And that a *bona fide* attempt to pay the taxes, frustrated by the fault of the officer, *stands as the equivalent of actual payment. Breisch v. Coxe*, 81 Pa. St. 336.

In that case, AGNEW, C. J., delivered the opinion of the court, remarking: "It must be conceded that the payment of taxes is a duty, and a failure to perform it is the fault of the owner. But payment is one thing, and the steps leading to it are another. For the latter, the owner is not responsible. He can not assess himself, or know what is charged against him. He must await the action of the agents of the law. He can not pay until he is informed of what he is to pay. To perform the duty of payment he must apply to the treasurer for the taxes charged against his land. If this officer fail to give him the information on demand, on what just principle shall it be said he has not performed his duty? It is said, there are the tax books open to inspection, let him search them. But this is neither his business nor his duty. As was said in *Dietrich v. Mason*, 7 P. F. Smith, 40, the treasurer is the legal custodian of the books and entries of the taxes necessary to show the sum to be tendered. This information it is his duty to give, and he can not lay the books before the owner, and compel him to search for himself. The knowledge of the latter may be inadequate to find what he needs. If, then, the owner pays all the taxes stated by the treasurer, he has done his whole duty. He can do no more. *Baird v. Cahoon*, 5 W. & S. 540; *Laird v. Hiester*, 12 Harris, 464. His claim to be protected against a sale of his land for taxes he stood ready to pay, but which the proper officer has failed to present to him on demand, is quite as great as that of the purchaser to be protected against

the act of the same officer in making a sale for taxes actually paid. Indeed, his equity is greater, for he has a prior title to the land, which has been wrongfully exposed to sale for an unknown trifle of tax. He would lose a valuable property, sold for no real equivalent, while the purchaser pays but a trifle of tax and costs, which, in most instances, he can have returned to him, if the sale be void. In point of want of knowledge they stand upon a par; the owner's ignorance of the tax being the equivalent of the purchaser's ignorance of the attempt to pay it. As a matter of fact, too, purchases at tax sales are known to be full of risk, and rarely more than a tithe of the value of the land is bid. It is but just, then, that a *bona fide* attempt to pay all the taxes, frustrated by the fault of the treasurer, should stand as the equivalent of an actual payment. It is an almost universal rule, which substitutes a tender for performance, when the tender is frustrated by the act of the party entitled to performance." See, also, Cooley on Taxation [2 Ed.], 450, and cases cited.

If ever there was a case to which the observations of Chief Justice Agnew should apply in all their force, it is this one. Here an aged and unlettered man who had long before passed the seventy-year milestone of life, applies to the collector from time to time to pay his taxes. He is given information on which he acts; he pays all demands made of him. Finally, as to other and subsequent years, he receives a statement, said by the collector to embrace *all* the taxes due on his land. Through a friend he pays all demanded of him, and yet, in fourteen days thereafter, his land was sold on a judgment for taxes of which judgment and taxes he was wholly ignorant.

Others may say it, but I for one will never say that this old man is to be deprived of his land through

VOL. 126—17

the *neglects* and *blunders* of the *state's chosen agents.* *Others* are bound by the acts and blunders of *their* agents, and I know of neither rule nor reason which prevents the state from being likewise bound in similar circumstances. I think, therefore, that the honest endeavors of this ignorant old man to pay his taxes should stand as the equivalent of payment and a tender of payment, and that it should have the effect of discharging the tax lien and prevent the tax sale from having any efficacy. Of course the discharge of the lien would not remove the tax debt; that would still remain and could be recovered.

The latter half of section 7646, enacted in 1887, evidently contemplates that land sold when taxes have been paid can be recovered, or else its provisions are without meaning.

3. Numerous irregularities occurred in the tax proceedings, as already stated, beginning with the failure of the county court to examine and correct the delinquent list, as well as the failure of the officers to note on the back tax book the fact of the land in question being delinquent, and of suit being brought against it, with the further fact of the notice of the sheriff's sale being insufficient.

Now, it has frequently been ruled that the entire lack of notice will not invalidate a sheriff's sale on execution, where the purchaser, a stranger, has not participated in occasioning the irregularity, etc. *Draper v. Bryson*, 17 Mo. 71; *Curd v. Lackland*, 49 Mo. 451, and other cases. But this rule does not hold when the *plaintiff* in the execution, or his *attorney,* is the purchaser at the execution sale. In such case the purchaser is chargeable with all precedent irregularities. His purchase, like a demurrer to a pleading, searches out all previous faults and holds the purchaser chargeable with them, whether he was aware of them or not. "But if

notice of vices or infirmities in the proceedings is brought home to strangers purchasing at execution sales, then, as we have shown in the preceding section, such vices or infirmities may impair the title in the hands of such purchaser with notice. But it is incumbent on the plaintiff and his attorney to keep informed of all the proceedings taken in the case under their direction, or by virtue of their authority. The law will not permit them to be ignorant of such proceedings. Hence, if there is any irregularity in the proceedings, neither the plaintiff nor his attorney can, on becoming purchaser under the execution, protect his title by showing that he was ignorant of the irregularity. * * But it is certain that neither the plaintiff nor his attorney can ever be treated as purchasers having no notice of vices and irregularities in the judgment and proceedings; and that whatever rights and equities the defendant in execution may assert against a purchaser with notice, he may also assert against the plaintiff or his attorney, whether either had any actual notice or not." 2 Freeman on Executions [2 Ed.], sec. 340.

And in this connection it is not to be forgotten that Harness was a resident of Barton county, and in consequence of this he was entitled to be notified, for so the statute provides, that his land in Newton county was going to be sold under execution. R. S. 1889, sec. 4943. This section makes it the duty of the plaintiff in the execution to notify the defendant therein of the fact of the intended sale.

But this court has frequently decided that where a party has been personally served with process, or, though resident in a different county, *engages in litigation in a county where he has land, and a judgment against him results*, that *there*, having been virtually notified by such judgment, he needs no formal notice that execution

will issue, for this he may expect. *Harris v. Chouteau*, 37 Mo. 165; *Hobein v. Murphy*, 20 Mo. 447; *Buchanan v. Atchison*, 39 Mo. 503; *Ray v. Stobbs*, 28 Mo. 35; *Harper v. Hopper*, 42 Mo. 124.

*Lohmann v. Stocke*, 94 Mo. 672, *after citing three* of the above authorities, and *quoting from 42 Mo.*, announces that, where the judgment is rendered in a county where the defendant *has land*, that there he *need not be notified*. This ruling was an entire misapprehension of our former rulings on the subject, and has no basis on which to rest, and we therefore decline to follow it.

Here Harness took no part in the litigation in Newton county; was ignorant of its pendency, and therefore the rule announced in 37, 39 and 42 Mo. does not apply to him, and, in consequence, the failure to notify him was an irregularity.

The premises considered, we hold that the decree entered for plaintiff should be affirmed. BURGESS, J., concurs in the first and second paragraphs of this opinion; GANTT, P. J., in that portion of the third paragraph which holds the notice of the sheriff's sale was irregular in consequence of the name therein being *"Horners"* and on this he is for affirming the decree.

### SEPARATE OPINION.

GANTT, P. J.—I concur in affirming the judgment of the circuit court because of the irregularity in the notice of the sale of plaintiff's land under the tax judgment. While such an irregularity would not avoid the sale as to an innocent third person, as defendant was the attorney who obtained the judgment and the purchaser at the sale, he is chargeable with notice of the irregularity. But I am **con**strained to dissent from

the opinion of my learned brother on the other propositions announced in his opinion.

In my opinion, the allegation of nonresidence in the petition and the affidavit of nonresidence, each authorized the court to obtain service on the plaintiff here, the defendant in that action, by publication, and it is immaterial that the clerk also issued a summons on which a *non est* return was made. When the court, in regular session, ordered publication to be made, it had jurisdiction to so order and was not required to give its reasons therefor. The statute required the defendant to be notified, but it was not necessary to recite the contents of the affidavit or the *non est* return, and a misrecital in no manner affects the jurisdiction, as a lawful notice was given of the pendency of the action. R. S. 1889, sec. 2022.

Holding, then, as I do, that the court had jurisdiction, I think all questions as to the regularity of the assessment were precluded by the judgment in the tax case and it is not open to collateral attack in this action. The opinion on this point, I think, is in direct conflict with many adjudications of this court. *Jones v. Driskill*, 94 Mo. 190; *Gray v. Bowles*, 74 Mo. 419; *Gibbs v. Southern*, 116 Mo. 204.

Nor do I think it was necessary that a notice of the issuance of the execution should have been sent to Barton county, as the execution issued to the sheriff of the county in which the judgment was obtained. *Lohmann v. Stocke*, 94 Mo. 672; *Harper v. Hopper*, 42 Mo. 124; *Harris v. Chouteau*, 37 Mo. 165; *Buchanan v. Atchison*, 39 Mo. 503.

Burgess, J., concurs with me as to the last point on the question of notice of the execution.