## HAMPTON v. McCLANAHAN *et al., Appellants.*

### Division One, April 1, 1898.

1. **Fraudulent Conveyances:** MESNE TRANSFERS. Where several conveyances of land are made in pursuance of the fraudulent acts of the arch conspirator in the fraud, all the *mesne* grantees will be charged with his fraudulent acts, although he was not himself a grantee.

2. **Tax Sale:** FRAUD OF PURCHASER: EJECTMENT: EQUITY: REDEMPTION. Where the facts of a case show that Hampton, as tax attorney, caused a tax suit to be instituted against defendant's deceased father, as a non-resident, and at the execution sale thereunder became the purchaser of eight or nine hundred acres of land; that soon thereafter defendant sent his agent from Boston, and, for a deed from defendant to Hampton of forty acres, Hampton quitclaimed the rest of the land to defendant; that at that very time Hampton had caused suits to be brought against defendant for the taxes for another year, the tax bill, petition and order of publication all being in his handwriting; that defendant's said agent went to the collector and carefully inquired what taxes were due, paid what he was told were due, and was told that no others were due; that Hampton knew that defendant's agent was desirous of paying all tax liens against the land at that time; that at the sale Hampton sent his attorney to one Loy to have him buy in the property for his wife and his partner's wife; that Loy bought the land for $50, which amount was paid the collector by Hampton, and then Loy by quitclaim, for nothing, but at an expressed consideration of $2,000, conveyed the eight or nine hundred acres, by him thus purchased, to Hampton's sister, the plaintiff, who lived in Tennessee—the title will be divested out of said sister and invested in the defendant in a suit in ejectment in which these facts are set up by way of defense, upon the payment by the defendant into court of the money paid by Hampton at the tax sale.

*Appeal from Greene Circuit Court.*—HON. JAMES T. NEVILLE, Judge.

REVERSED AND REMANDED (*with directions*).

*James R. Milner* and *Heffernan & Buckley* for appellants.

(1) The proceedings of Hampton in the acquirement of this property were dishonest, inequitable and

a fraud on the rights of defendant Sleeper, and for that reason the title should be divested out of plaintiff and vested in defendant. *Baldwin v. Whitcomb*, 71 Mo. 651, *loc. cit.* 659; *Hodge v. Hubb*, 94 Mo. 489, *loc. cit.* 553; 1 Story's Eq. Jur. [2 Ed.] 252; *Bresnehan v. Price*, 57 Mo. 422; *Sanderson v. Voelcker*, 51 Mo. App. 328. (2) The defendant having tendered and offered to pay all taxes discharged the State's lien, and hence all proceedings were void thereafter and no title was acquired by plaintiff, and on that ground should be set aside and title divested. *Hodge v. Hubb*, 94 Mo. 489; *Harness v. Cravens*, 126 Mo. 233.

*Wm. O. Mead* and *T. T. Loy* for respondents.

All the parties were before the trial judge and he seeing and hearing all the evidence and observing the kind and character of proof and there being abundant evidence to support his findings, this court will defer largely to his finding as being in accord with the weight of evidence and the law rightly applied, and the judgment being for the right party this court will affirm it.

ROBINSON, J.—This proceeding was begun as a suit in ejectment by plaintiff against I. N. McClanahan and Sam Caldwell for certain lands in Greene county of this State. On motion Jacob Sleeper was made a party defendant, and filed his answer in connection with the defendant Caldwell, setting up an equitable defense and asked affirmative equitable relief, thus converting the action into an equitable proceeding. The suit was then dismissed as to the defendant McClanahan.

The defendant's answer alleged that the defendant Jacob Sleeper has for many years been the owner of

the forty acres of land in controversy, together with a
large body of other land in Greene county, Missouri,
amounting to some eight or nine hundred acres, and
that one James B. Hampton procured all of said lands
to be sold for taxes due or pretended to be due for
years prior to 1891, under a judgment against one
Jacob Henry Sleeper, and that at said sale said James B.
Hampton became the purchaser and had the deed
to said land made to his wife Grace F. Hampton, and
that she afterward, at his request, conveyed an undi-
vided one half interest in all of said lands to one Mollie C.
Duncan, the wife of the business partner of said
James B. Hampton, and that in the latter part of the
year 1893, for a valuable consideration the said Hamp-
ton caused to be conveyed to the defendant Sleeper all
the real estate included in the sheriff's deed to his wife
except one forty acre tract, thereof, for which defend-
ant Sleeper made the said Hampton a deed.    That
during the time pending the settlement that lead to
the interchange of deeds between defendant and the
said Hampton the said James B. Hampton, who is the
real party in interest, and his sister, the plaintiff
herein, conspired together to defraud said Sleeper
out of his said lands in Greene county, again pro-
cured tax proceedings to be instituted on publication
against the defendant Jacob Sleeper as owner of said
land for pretended taxes due for the year 1891, and
afterward had all of defendant's lands sold, and for
the purpose of hiding himself from view in the trans-
action procured one T. T. Loy to buy the land in for
him but to take the deed thereto in the name of him, the
said Loy. That said purchase or intended purchase was
made in fact for and in the interest of said James B.
Hampton.    That the plaintiff in this case, acting for
the said James B. Hampton, had conveyed to her by
said Loy and wife all the lands covered by his deed,

including the tract now in controversy. That said conveyance to her was for the pretended consideration of $2,000, but in fact was without consideration, being in fulfillment only of the fraudulent purpose and agreement entered into between said plaintiff and James B. Hampton to injure said defendant Jacob Sleeper, and to defraud him out of his lands.

The defendant Sleeper further states that he had no knowledge or information whatever of any proceedings against himself whereby he was charged with taxes on any of his real estate in Greene county, nor of any proceedings by the collector of said county to collect the same, nor of any judgment against himself or his real estate, or of any sale thereunder for the taxes of 1891. That during the fall of 1893, when defendant was having his first settlement with said James B. Hampton on acount of his purchase of defendant's lands under the tax proceedings against his father Jacob Henry Sleeper, the defendant, as the said Hampton well knew, sought and attempted to pay off and discharge all taxes of every kind against his land, and for that purpose went to the collector's office and gave to the collector a list of the property owned by him in Greene county and told him he wanted to pay all taxes on the same and was ready and willing to do so, and that he did pay all the taxes due or claimed to be due by the collector and took his receipt therefor, and supposed and was assured by the collecter that all taxes against his land previous to that time were paid; that notwithstanding defendant's payment of all taxes claimed to be due upon his lands and the assurance made to him that all taxes had been paid up to that date, two tax suits had been begun against him, as the owner of said lands, for alleged taxes due for the year 1891, at the instance of said James B. Hampton and at the sale of his lands under those proceedings the said James B. Hampton,

through his agents named as aforesaid, became the purchaser for the sum of $50. That said lands so sold and purchased by said Hampton through his agents were worth $20,000. That the plaintiff through her agent Loy and James B. Hampton well knew at the time there were no taxes due on the property of the defendant Sleeper owned in Greene county, and knew that defendant had paid all taxes thereon as reported to him by the collector of said county; that the defendant Caldwell is now in possession of said forty acre tract involved in this suit claiming same through the defendant Sleeper, and that the holding of the title deed to said premises by plaintiff is in fraud of the rights of the defendants herein. That the defendant Sleeper now offers and tenders to said plaintiff the said sum of $50 or any other expense she or the said James B. Hampton may have been to in the purchase of this and the other lands of defendant Sleeper, and that defendants are without remedy at law. Wherefore the premises considered the defendant prays, *first*, that the said deed made by the sheriff of Greene county to said T. T. Loy and the said deed made by said Loy and his wife to Dixie B. Hampton be canceled, set aside and for naught held; *second*, that the title held or claimed by said Dixie B. Hampton be divested out of her and vested in the defendant Jacob Sleeper; *third*, for all other and further relief to which in equity and good conscience the defendants may be entitled.

The abstract of the record does not show the filing of a reply by plaintiff, but the case was tried by the court on the twenty-second day of May, 1895, as if a reply had been filed, and a judgment was rendered for the plaintiff, from which defendant prosecutes this appeal.

To us all the essential allegations of facts set up in defendant Sleeper's answer seems to have been sub-

stantially admitted or proven. James B. Hampton was the real purchaser of the land at the execution sale for taxes. Mr. Loy the grantor in the sheriff's deed, and Dixie B. Hampton, his subsequent grantee, are mere figureheads for the purpose of hiding the. real purchaser from view.

To the following questions James B. Hampton answers:

"*Q.* Now, that deed was made in the name of your sister? *A.* Yes sir, they were by Mr. Loy at our request.

"*Q.* Now you say it was arranged between you and Mr. Loy that the purchase under the second deed was for your benefit. You were to be the real purchaser? *A.* I told Col. Mead something to this effect: That having had these negotiations with these parties which had never been carried out and so on and to protect outsiders, I did not like to buy it in my own name, and asked him to get some one to buy it in for my wife, that is for my wife and Mrs. Duncan, and that was arranged, and whatever arrangements were made with Mr. Loy was made by Col. Mead.

"*Q.* Col. Mead was your attorney? *A.* Yes, sir.

"*Q.* Loy afterward quitclaimed this land to your sister? *A.* Yes sir.

"*Q.* There was no other additional consideration for that except the fifty dollars that was paid at the sale. *A.*  No, sir.

"*Q* That fifty dollars was furnished by you? *A.* Yes, sir; furnished by me for those parties. I speak for myself. I was acting in that capacity for my wife and Mrs. Duncan."

While it is true that Hampton in this particular part of his statement says that he was acting for his wife and Mrs. Duncan (who by the way is the wife of his business partner) for all the purposes of this case

it is as if he had been acting for himself in the premises. To one inclined to be suspicious of circuitous transactions, however, an impression might be aroused from a review of all the facts that Hampton was acting solely for himself, and that the talk about the purchase of the land for his wife, or his wife and Mrs. Duncan, like the after use of the names of Mr. Loy and his sister Dixie B. Hampton (the plaintiff herein) was a mere cover to hide the operation of the real mover in the entire transaction. But if James B. Hampton was acting in fact for the benefit of his wife and Mrs. Duncan, they would be bound as he would be, in this suit wherein Dixie B. Hampton is prosecuting for the real purchaser of the land whoever he or they may be. Hampton's knowledge of any facts that would defeat the sale of this land to him; his knowledge of the fraud that was being practiced upon the rights of the defendant Sleeper in the prosecution of the tax suits against his lands, without personal notice, after he had paid all taxes that the collector had informed him were due on the land up to 1893, would be their knowledge, and his participation in the fruits thereof by buying in the lands under the circumstances for their benefit would be their participation. Under the facts as disclosed at the trial it is proper to treat the whole transaction as if James B. Hampton had purchased the land at the tax sale in his own name and for his own benefit, as alleged in defendant's answer. The perpetration of a wrong against the rights of the citizen should receive no higher sanction because done in the interest and for the benefit of one's wife and the wife of a business partner (if the court should be inclined to believe that story) than if done in the name and for the sordid purpose of self; nor does the multitude of intervening non-interested grantees, through whom the title to the

lands improperly sought to be acquired has passed, rob the effort of any of its unfairness.

The facts in this case show that this land, together with about eight hundred acres of other lands owned by the defendant Sleeper, was first sold in 1891 for taxes, and that James B. Hampton became the purchaser thereof and had the deed thereto made to his wife; that the assessment and all the proceedings in the suit that resulted in the sale of said lands for taxes were made and prosecuted against the father of the present defendant, who at the time was dead; that when said suits were begun and the sale of the land was made for the taxes due thereunder (at which James B. Hampton became the purchaser in 1891 for his wife), the defendant Jacob Sleeper was in fact the owner of the land and at that time lived in the city of Boston in the State of Massachusetts. That when the defendant Jacob Sleeper in the summer of 1893 heard of the sale of his land and the purchase thereof by James B. Hampton in the name of his wife, he sent his agent and attorney, one Mr. Hodges, from Boston, Massachusetts, to Springfield, Missouri, the county seat of Greene county, wherein said land was located, to settle and adjust the matter of Hampton's claim to his land on account of the tax sale and his purchase thereat; and to pay all taxes and claim of every character that might be found to exist against it; and that while at Springfield said agent entered into an agreement with said Hampton whereby the defendant Sleeper was to make to said Hampton a deed to one forty acre tract of the land covered by the sheriff's deed to Hampton's wife, if Hampton and wife would quitclaim back to him all the balance of the land named in the sheriff's deed, in order to relieve defendant's lands from the cloud cast upon it by said Hampton's deed. That when he accepted the deed to the forty acres of defend-

ant's land, and made a quitclaim back to defendant for the balance of the land included in the sheriff's deed made in 1891, he knew that two tax suits were then pending in the courts of his county against these lands, so reconveyed by him and wife to defendant, on a petition which had been prepared and written by himself for taxes due for the year 1891; that these suits were against the defendant Jacob Sleeper as the non-resident owner of the lands, although at the time of filing suit Hampton was claiming the land through his wife by reason of his purchase in 1891 at the execution sale for taxes due for previous years. Hampton also knew that the object and purpose of the agent of the defendant in coming to Missouri was not only to adjust and straighten out all conflicting claims growing out of the first tax sale of his lands in Greene county in 1891, but to pay all taxes that were then due against it, and to that end had gone to the collector of the county and given him a list of all the property owned by his principal in Greene county and told him he wanted to pay all the taxes due and unpaid on the land, and was ready and willing to do so, and that he did pay all the taxes due or claimed to be due by the collector, and took his receipt therefor and was assured by the collector that all taxes on the land were paid up to that date. Hampton had a knowledge of all these facts, and had just been the recipient of defendant' Sleeper's liberality to the extent of getting a deed to one forty acre tract of this land for practically nothing, as Hampton's title to the land that he quitclaimed back to defendant Sleeper was in fact absolutely worthless to him except for the purposes of embarrassing defendant, being merely an eight hundred acre cloud, traded to the owner whose land it shadowed, for forty acres of substantial real estate. Can under such circumstances the sale of defendant's lands, worth $5,000 to $6,000 or

more, for the insignificant sum of $50, under proceedings against him as a non-resident defendant for taxes that he had been assured were paid, be sanctioned, so as to deny the right to redeem upon his offer to reimburse the purchaser for the money that he has expended? Without being willing to assert the broad doctrine as announced in *Hoge v. Hubb*, 94 Mo. 489, and in *Harness v. Cravens*, 126 Mo. 233, and as here contended for by counsel for defendant, that the tender and offer to pay by defendant all the taxes due on the lands to the collector operated to discharge the State's lien so as to render void all proceedings afterward by the collector to enforce the same, and for that reason declare that no title was acquired by the purchaser of the land at the execution sale for the taxes that were in fact due and unpaid, we have no hesitancy in saying that it would be a fraud upon the rights of the present defendant to suffer the plaintiff in this cause to retain the lands so purchased by him, when defendant offers to return to him the full amount of his expenditure.

In addition to the fact of the gross inadequacy of price paid for the land at the sale, and that the defendant Sleeper had been deceived into believing that all taxes against it had been paid so as to quiet all possible apprehensions of trouble from tax proceedings, one must be impressed by the circumstances surrounding the entire transaction that the tax suit against defendant's land was to accomplish just what was done, to wit, divest him of title that the same may be invested by way of a sale in some one for the benefit of James B. Hampton rather than a good faith and disinterested effort to collect the state and county taxes due on the land. Hampton's influence is manifest throughout the proceedings. His spirit is made visible in the handwriting upon every paper filed in the case,

The tax bill, the petition, and the order of publication, all bear his chirography, and although not visible at the sale, he was very substantially present so far as results to him were concerned, as is shown by the questions and his answers thereto as above given. While not present at the sale, and while "he did not like to buy in the land in his own name," as he says, he did take the precaution to ask Colonel Mead, his attorney, to get some one to buy in the land for his wife and Mrs. Duncan, and Colonel Mead did get a gentleman by the name of Loy to bid on the lands and this same Hampton did pay to the sheriff $50, the amount of Loy's bid for the land, and Loy in turn at the instance and request of Hampton did for an expressed consideration of $2,000 but in fact without receiving or expecting a cent, transfer these lands to a sister of James B. Hampton living in the State of Tennessee, the present nominal plaintiff in this action. Thus it may be said that James B. Hampton was not only manifest in all the proceedings that lead up to and resulted in the sale, but he was sufficiently present at the sale to have reaped the entire fruits thereof.

If the two tax suits begun against this land in which James B. Hampton played so prominent a part in their early inauguration, had been as carefully watched when the time for the State and county to realize at execution sale on the apparent objects of those suits, to wit, the collection of the taxes due, the county and State, instead of Hampton, would have received some benefit from the sale; but as it was the county and State in whose interests the suits were nominally prosecuted got nothing, and Hampton, as the result shows got all (the title to eight hundred and odd acres of land). The $50 paid by Hampton to the sheriff would not pay for the costs of the two proceedings. Yet Hampton as a final result of the two suits got

eight hundred and odd acres of land, on which, before the institution of the tax proceedings under which he purchased, the State and county held a lien for sixty odd dollars for unpaid taxes, and which by this proceeding was wiped out and the land went to Hampton or his representatives clear and freed from that lien. Instead of being a suit for the benefit of the State, its only result was to wipe out its lien and invest the title to the land in Loy for the benefit of Hampton clear and freed from all liens and incumbrances. Viewed from a practical business standpoint, where results count for much more than mere form and ceremonies, one must conclude that this suit was instituted rather for the benefit of James B. Hampton than for the State, who appears upon the records as the plaintiff prosecuting a suit to collect a tax demand. The real action, judged by results accomplished, oftentimes is clearly discernible through the shadowy veil of form that surrounds the proceeding, and the bold assertions of the reality are heard above the faint whisperings of pretense. If the last two suits instituted against defendant's land in 1893 for the taxes of 1891 were begun and prosecuted in the interest of the State that the taxes due might be collected, the effort was a most consummate failure, and the true facts have been obscured by the most awkward surroundings. To the mind of the writer, however, it is most manifest that the inspiration of these proceedings against defendant's lands was James B. Hampton, for the purpose of accomplishing just what took place at the sale—a divesture of defendant's title to the land, and the investing of title to the same by purchase at execution sale, in some one for the benefit of James B. Hampton.

For the reasons stated above, the judgment of the circuit court will be reversed and the case remanded, with directions that it enter up a judgment in accord-

ance with the prayer of defendant's answer, divesting the plaintiff Dixie B. Hampton of the title to the land in suit, and investing the same in the defendants upon their paying into court for the use of plaintiff, such proportion of the amount paid by James B. Hampton for the entire land, as the value of the land in controversy bears to the value of the tract so purchased at the execution sale by said Hampton.  BRACE, C. J., WILLIAMS and MARSHALL, JJ., concur.